## 24.  NORTH BRITISH AND MERCANTILE INSURANCE COMPANY *v.* TYE.

1. Insurance is a matter of contract. An insurance policy is a contract of indemnity for loss, and the intention of the parties, if it can be ascertained, must determine the sense in which the terms employed are used. This intention of the parties must be sought for in accordance with the true meaning and spirit in which the agreement was made and expressed in the written instrument, and the ordinary and legal meaning of the words employed must be taken into consideration.

2. In the absence of proof that it was the intention of the parties to include houses disconnected with a "two-story frame building and its additions adjoining and communicating," a contract thus describing the insured property will not be construed to include a servant's house 150 feet distant from the two-story frame building, although occupied exclusively by domestic servants employed in the dwelling-house of the assured, and although connected therewith by a system of call-bells.

3. In some cases the valuation of the property and the premium collected thereon may be submitted to the jury, in ascertaining the intention of the parties, in addition to the intention to be drawn from the words used to describe the property insured in the policy.

Action on insurance policy, from city court of Atlanta—Judge Reid. March 29, 1906.

Argued January 10,—Decided February 13, 1907.

*King, Spalding & Little,* for plaintiff in error.

*Spencer R. Atkinson, John L. Tye,* contra.

RUSSELL, J. The question in this case is one of liability or non-liability under a state of facts undisputed. Mrs. Carrie W. Tye brought suit on two policies of insurance which she had on her dwelling at 740 Peachtree street in the city of Atlanta; and the result of the issue depends upon the construction which is to be placed upon the descriptive terms of these insurance policies. The property insured was described in one of them as "$4,000 on her two-story frame, shingle-roof building and additions thereto, occupied by assured as a dwelling only, and situated at No. 740 on the west side of Peachtree street in Atlanta, Georgia;" the other as "$4,000 upon the two-story shingle-roof frame building and its additions adjoining and communicating, while occupied as a dwelling-house, and situated at No. 740 on the west side of Peachtree street, Atlanta, Georgia." The lot upon which the dwelling in question stood fronts eighty feet on Peachtree street, and extends back four hundred feet to another street. The main dwelling occupied the front; and commencing at the rear of the house and extending around the entire lot to the rear of the house was a plank enclosure. In the rear of the dwelling and within this enclosure, at a distance of about one hundred and fifty feet, was a one-story two-room servant house, which at the time of the fire was occupied by the domestic servants of the assured. This servant's house, which was entirely apart from the dwelling or any other building, was connected with the dwelling by two wires and electric call-bells, by which the

servants might be called and could respond. On the other side of the lot there was a barn, forty or fifty feet from the house, used for stables and the storage of the family vehicles. It was not connected with the house by means of electric bells or otherwise. A chicken-yard about fifteen feet square, surrounded by a wire-net fence, was situated between the dwelling and the servant's house, about fifty feet from the dwelling. It was in proof that no one dwelt in the barn. On Nov. 22, 1903, a fire occurred, partially destroying the servant's house. The amount of the loss was $228. A demand was made for indemnity. One other insurance company, which had issued a policy for a like sum as these two policies above described, paid its pro rata share of the loss, leaving $152 claimed to be due by the defendant company. The company admitted the amount of the loss, but on January 8, 1904, denied its liability, placing its denial on the ground that the servant's house above referred to was not within the terms of and was not insured by its policies. The case was tried in the city court of Atlanta, on March 29, 1906. At the conclusion of the plaintiff's evidence, which presented the case above stated, the defendant moved for a nonsuit, upon the grounds that the plaintiff had not made out a case, and that the facts showed that the servant's house was not insured by the policies introduced. The court refused to nonsuit the case, and, on plaintiff's motion, directed a verdict in her favor for one hundred and fifty-two dollars, with interest from January 8, 1904. The defendant company, now plaintiff in error, brings the case here, alleging error in the refusal of nonsuit and in the direction of the verdict, the error, as insisted, being that the servant's house is not covered by the policies sued on. The sole question for determination, it will be seen, is this: Was the servant's house, above referred to, covered by the terms of the policy?

The policies are slightly different in form of expression. They are both upon the same building, and in one the insurance extends to "additions thereto," and in the other to "its additions adjoining and communicating." To put the question more exactly from the contract of insurance: Do the words "the two-story shingle-roof frame building and its additions adjoining and communicating," and "her two-story frame shingle-roof building and additions thereto," cover a servant's house situate one hundred and fifty feet distant, and only connected therewith by two small wires? The

plaintiff in error contends that the words do not so signify; that such a separated independent structure is in no legitimate sense either an "addition to the two-story frame shingle-roof building" or one of "its additions adjoining and communicating." The defendant in error insists that either form of expression necessarily includes the house in question, as a component part of the domestic establishment, and that without the use of the word "addition," whether communicating or adjoining, or otherwise; "that the subject of the insurance was a dwelling-house, and that as the words 'dwelling' and 'dwelling-house' signify habitation, the meaning of neither can be confined by construction to a single apartment, but comprehends the entire congregation of buildings, main and auxiliary, used for the purpose of abode."

Led into a comprehensive view of the question by the very scholarly brief of the learned counsel for the defendant in error, we have made a somewhat extended examination of the authorities, and have been much interested in the definition of the term "dwelling-house." We have carefully considered the various authorities cited by the counsel for defendant in error to sustain his position, and it is plain that in certain senses the term "dwelling-house" may embrace a cluster of buildings. In the case of Workman v. Insurance Company, 22 Am. Dec. 141, it was held that the word "house," in the common, ordinary acceptation of the term, embraces everything pertinent and accessory to the main building, and that this is the significance that must be given to it when used in policies of insurance. And Mr. Bishop defines a "dwelling-house" as "a permanent building or cluster of buildings in which a man with his family resides. He need not so construct his habitation that all the shelter he requires will be under one roof; therefore the word 'dwelling-house' embraces in law the entire congregation of building, main and auxiliary, used for abode." And upon the same line the word "dwelling-house" will be found to be defined by numerous other law-writers, such as Bouvier, Angell, and Black. In our opinion the words have a meaning in Georgia which varies with the sense in which they are used. There is one significance attached to the word "dwelling" when considered in connection with the charge of burglary. There the breaking of any house within the curtilage makes complete the offense, provided such breaking be with the criminal intent specified in the statute. There is another meaning

in connection with the offense of arson, dependent upon its occupation; and excepting these two special meanings, there is the use of the word and its significance as commonly used and popularly understood, which, as we will show hereafter, will not include houses disconnected from those occupied by the family.   But we think the decision of this case does not depend upon the definition of the word "dwelling-house," because the building insured is not only said to be a "dwelling," but it is further described and identified by the words "her two-story frame, shingle-roof building and additions thereto," in one policy, and "the two-story shingle-roof frame building and its additions adjoining and communicating," in the other policy.   So that the real question is, not whether a cluster of disconnected houses may or may not in some instances constitute a "dwelling-house" (to which proposition we fully agree), but whether it can be fairly understood as a part of the contract of insurance that "a two-story frame building and its additions," used as a dwelling-house, shall also include a servant's house 150 feet away, so as to render the insurer liable for damage by fire to the servant's house, though there was no fire or damage to the two-story frame building.   Wherever there is a doubt as to the meaning of words, they are to be given their ordinary significance; and policies of insurance, notwithstanding the peculiar language in which they are generally couched, are at last but written contracts to be interpreted by the same rules as other contracts, and to be enforced according to the intention of the parties, that construction most liberal to the insured being preferred wherever there is ambiguity in the language used.   We do not think there is any ambiguity here.   We can not bring ourselves to the conclusion that, giving to words their reasonable and ordinary intendment, the servant's house can be called an addition to the two-story frame shingle-roof building situated at No. 740, on the west side of Peachtree street, Atlanta, Georgia.   It was on this construction that our learned brother of the trial bench directed the verdict for the plaintiff; but we are compelled to differ with him, not only by our understanding of the ordinary and general meaning of the descriptive words used in the policy, but because that view is enforced by a consideration of the disastrous effect of any other construction as a matter of public policy.

We are aware that in some States buildings that are disconnected

have been connected by legal construction; and we are cited to the cases of Phœnix Insurance Co. *v.* Martin, 16 So. Rep. 417, Mutual Insurance Co. *v.* Rowe, 36 N. W. Rep. 594, and Gross *v.* Milwaukee Mechanics Ins. Co., 66 N. W. Rep. 712. We have examined these cases, and in doing so were led into a wide field of research by a consideration of cases therein mentioned. It may be safely asserted that the general principle deducible from the rulings in all the States except one is that there has been an inseparable identity of use, no matter what the nature of the structure, where insurance on one building has been made to cover another. In Phœnix Ins. Co. *v.* Martin, supra (decided by the Supreme Court of Mississippi), a policy on a two-story brick building and additions thereto, occupied as a dwelling, was held to include the building partly occupied by assured's servants, one of the rooms of which was used as a laundry, although not annexed to the brick building. The opinion in the case is very brief, and the judgment was based entirely on the conclusion that the word "additions" must have operation, and, construing it most favorably to the insured, could only refer to the building near by, when there was "no other building in assured's yard which could be claimed as an addition to the main building, not built in it as a part of the house originally." In the other cases the issue naturally turned on the identity of use, and the inclusion, by that use, of all the articles destroyed, in a term of description applicable alike to all of them. We are not prepared to adhere to the principle laid down by either the Supreme Court of Mississippi or the Supreme Court of Wisconsin; though, if we were inclined to do so, these cases are clearly different in several respects from the one now under our consideration. An "Addition" means something added to another. It implies physical contact. "Adjoining" means when things meet at some line or point of juncture. Objects are adjacent when they are close to each other, not necessarily in actual contact. It is true that one of the policies used the word "communicating," and the evidence showed that there was communication by call-bells between the dwelling and the outhouse. But in this age when communication by wire can be had, no matter what the distance nor what the intervening objects, by telegraph and telephone, it would hardly be that the word "communicating" could be said to be used in an insurance policy in the sense insisted upon by the defendant in error.

At least we are not prepared to so hold. As we understand the common acceptation of the word "communicating," as referring to the different portions of dwelling-houses (whether constructed originally all under one roof or not), they are houses so connected by some structure, forming a part of both, as to afford a passageway without going into the yard or getting on the ground. The Wisconsin case cited could have well been decided, as it was, upon the descriptive terms of the policy. There the property insured was a manufacturing plant described as "a planing-mill and its machinery," and of course this did not have as much reference to the buildings as to the entity used for manufacturing purposes, to wit, a planing-mill and its machinery. In the Mississippi case, though the distance was less than in the case before us, and there was no other building upon the lot, the court seems to have rendered the decision upon the idea that the word "additions" had to have something upon which to operate, which was then in esse. We are not prepared to follow this doctrine, even were it necessary to decide that question in this case. As we have above stated, the whole question here is embraced in the inquiry as to whether the word "additions," when coupled with the "two-story frame building," will include the servant's house. If the description had been simply the dwelling-house of the assured, we confess that we might have been in a sea of doubt, because so many considerations have been urged by different authorities as to the meaning of that term. It appears from the record that the policies upon which this suit was brought were for five years, and it is more reasonable to presume that it was in contemplation that additions might be made to the main two-story building within five years than that it was the intention of the parties to include a disconnected building used by servants 150 feet away. In Workman *v.* Insurance Co., 2 La. 507, a number of cases are cited to sustain a decision holding that certain outhouses which were damaged by fire were included in the description of the policy, which was as follows: "two houses situated in Dorsier Street adjoining the City Hotel between Custom House and Canal Sts., being number 5 and 7 in the city of New Orleans, in equal proportions of $10,000." The first reason given for the decision is based upon the fact that the assured paid a premium commensurate with the entire value of the outhouses, as well as the main buildings. And as the greater and lesser build-

ings were all included with a common brick wall which formed part of the buildings, and as it required the valuation of the lesser houses to be added to the greater in order to conform with the premium, the court held that the company was liable for the damage to the smaller houses, but, in doing so, concluded the decision with these words: "but it must be confessed that we have arrived at this conclusion not without doubts." In the decisions cited to sustain the judgment of the Louisiana court, importance is attached in some cases to the distance from the dwelling-house, and much to the use. In some cases, also, the necessity of a common enclosure is commented upon. The greater weight of authority seems to be that the use of the building must be accessory to the dwelling. In all of these cases (and most of them are criminal cases) the doctrine of the court seems to be supported by the use of the word as applied to cases of burglary. Nearly all of the cases referred to are prosecutions for arson or burglary; for it is in such cases that the terms "house" and "dwelling-house," etc., are most frequently defined. It is obvious, however, that cases of insurance furnish a means of construing the term "house" which is not found in criminal prosecutions. Insurance is a matter of contract, and the intention of the parties, if it can be ascertained, must determine the sense in which the terms employed are used. From the context or from circumstances it may be clear that a policy on a house was intended to cover only a single structure, or, on the other hand, that it was designed to cover accessory and contiguous structures; and it would only be in the absence of special indication of the intention that the term would be interpreted in accordance with the rules adopted in burglary and arson. The method of interpretation as applied to the word "house," and kindred terms, in insurance cases is very well indicated in the following decisions which sustain our view of the meaning of the word "additions" as conveying the idea either of identity of use or of something added to a building by adjoining it and being in some manner connected with said building. In Liebenstein v. Baltic Fire Insurance Co., 45 Ill. 301, insurance effected on stock in a certain chair factory was held to cover also stock contained in an engine-house appurtenant to the main building and connected with it by a platform and by belting extending from the engine wheel to the machinery in the factory. The court in that case said that the word "factory"

does not necessarily mean a single building or edifice, but may apply to several, where they are used in connection with each other for a common purpose and stand together in the same enclosure. On the other hand, in Liebenstein *v.* Ætna Insurance Co., 45 Ill. 503, which was a case of insurance on a part of the same stock, the policy described the stock as "contained in the two-story frame building occupied by the assured as a chair factory situated on the north side of Superior street;" and it was decided that the stock in the engine-house was not covered by the insurance. Here were policies in favor of the same assured, where the test was applied, and to our mind the latter case is nearly identical with the case at bar. In Blake *v.* Exchange Insurance Co., 12 Gray, 265, a policy was issued on goods "in a brick building situated on Main street in Cambridgeport, Mass., known as the Davenport & Co.'s Car Factory;" and it was held that it covered goods in the building erected as a wing against the rear wall of the main building, with opening between about three feet square, commonly enclosed with an iron door, it appearing that both buildings were used in manufacturing cars and were known under the general name of "Davenport & Co.'s Car Factory." In Washington Mutual Insurance Co. *v.* Merchants & Manufacturers Ins. Co., 5 Ohio, 450, insurance was effected on a "steam flouring mill;" and it was left with the jury to say whether a fire-kiln for drying corn or meal, in addition with a corn-meal mill, was known or usually incident to a "steam flouring mill." In White *v.* Mutual Fire Ins. Co., 8 Gray, 566, part of property insured was described as a wood-house, but, while the house was in fact a wood and carriage house combined, the two parts were only separated by a loose partition and the structure was known to the tenants and the neighborhood as "the woodhouse." In Home Mutual Insurance Co. *v.* Roe, the insurance was for a certain amount on a planing-mill and addition, and a certain amount on machinery therein. The disconnected building, which was 22 feet away, was the engine-room; and 'the court inferred the intention of the parties to insure the additional building (after defining the mill to be "the building with its machinery where some process of manufacturing is carried on") in the following words: "It conclusively appears that the engine-room was the only motive power for propelling any of the machinery in either of the buildings. The engine was used for no other purpose.

It was, therefore an essential part of the mill. Without it there would have been no complete mill. The insurance was upon the 'planing-mill building and addition,' and upon the 'machinery,' including shafting, gearing, belting, saws, tools, force-pump and hose therein.' It is claimed that the engine-room can not be construed to mean an 'addition' to the 'planing-mill building,' because it does not join directly upon the same; but, as we have seen, they were both essential to the completion of the mill. The motive power was by means of pulleys, belts, and shafts transmitted from the engine-room to the machinery in the main building. And the waste shavings, etc., were conveyed from the latter building to the engine-room to generate heat to propel the engine. Thus the two buildings were not only connected, but the machinery in each were inseparable, while the whole continued to be a planing-mill. The words, 'planing-mill building,' would seem to be broad enough to include the engine-room."

The words, therefore, of this contract are to be construed according to their general ordinary meaning, bearing in mind the other rule that the contract is to be construed according to the understanding and the intention of the parties, and remembering that even in cases of doubt, while contracts of fire insurance are to be construed more strongly against the insurer (*Northwestern Insurance Co.* v. *Ross,* 63 *Ga.* 204), still, in construing the contract the court can not go further than a fair construction of the language used will permit. Behling *v.* Northwestern Nat. Ins. Co., 117 Wis. 24; Guarantee Co. *v.* Bank & Trust Co., 183 U. S. 402. In *Roberts* v. *Willink,* 21 *Ga.* 103, Justice McDonald, delivering the opinion, says, "The contract must be construed by the words, unless there be some reason for taking the case out of this first great ruling for the construction of contracts." And in the case of *Clay* v. *Phœnix Ins. Co.,* 97 *Ga.* 53, Justice Atkinson says, "There is no greater sanctity and no more mystery about a contract of insurance than any other. The same rules of construction apply to it as to other contracts; and the true rule for their interpretation may be stated to be, that stipulations and conditions in policies of insurance like those in all other contracts, are to have a reasonable intendment, and are to be so construed, if possible, as to avoid forfeitures and to advance the beneficial purposes intended to be accomplished." We may be pardoned for saying that, in our judgment, were the rule of construction so extended beyond

what we conceive to be the ordinary meaning of a "two-story frame building and its additions" as to include as an addition a house occupied by servants 150 feet away, it would certainly be an unreasonable intendment, and create forfeitures instead of avoiding them. If these policies cover this separate servant's house, then, under their covenants, a breach of any condition of the policies as to the servant's house would vitiate the whole policy. The policy is an entire and indivisible contract. *Southern Fire Ins. Co.* v. *Knight,* 111 *Ga.* 622. And a breach of a condition which would work a forfeiture would avoid the entire policies, and not simply authorize an apportionment of the loss. Under the stipulations now before us, if mechanics had been employed for more than fifteen days in building, altering, or repairing the servant's house without permission, then the policy on the house would have been void. *Imperial Ins. Co.* v. *Coos,* 151 U. S. 452.

It is a fact, so generally known that the courts may take notice of it, that all over our State dwellings are insured which have outbuildings situated in more or less proximity to the main dwelling; that policies of insurance on these dwellings have provisions the violation of which imposes a forfeiture of their benefits; and to hold then that the word "dwelling" would include the outhouses (generally not intended to be insured in the same policy) would be to put it within the power of the insurers to avoid payment for the loss of the dwelling-house should any of the acts prohibited by the policy be done in the outhouses. For instance: if the owner of a dwelling had a disconnected servant's house, and the dwelling was destroyed by fire, and the policy had in it a provision against the keeping of gunpowder or dynamite or naphtha or other explosives; if the insurance company could show that in these outhouses (perhaps never visited by the owner or his family and yet occupied by his servants) there was gunpowder or kerosene or dynamite, and the dwelling-house should burn, the policy would be void and there would be no indemnity, by reason of the violation of these stipulations of the policy. There would be a breach of the contract and a forfeiture of the policy which it would be impossible for the insured (so far as the outhouses are concerned) to either foresee or prevent. It is a fact well known that at the present time menial servants in this State are in no such state of control as formerly, and that the supervision of their acts or responsibility

therefor, unless they be immediately under the eye of the employer, is at best but an ill-founded legal fiction.   Learned counsel for the defendant in error rely upon the principle of an identity of use, and insist that the servant's house is a part of the dwelling-house, because it was always occupied by the menial servants of the family; for, quoting from 2 Joyce on Insurance, § 1738, they say: "The word house, as used in a policy of insurance, embraces everything appurtenant and accessory to the main building and used as a part and parcel thereof, even though separated therefrom." Counsel argue that this construction and application of the word "dwelling-house" and "house" is peculiarly appropriate to our traditions and social conditions.   It is insisted that under the facts in the case "the servant's house in question was accessory and one of the appurtenances of the main building," because of the fact that in "this country, in which the policies sued upon were issued, and where they are sought to be enforced, from time immemorial the master has been accustomed to provide shelter for his menials under a roof, within the curtilage, separate from his own." The former existence of the conditions and relations referred to can well be considered a matter of judicial knowledge.   But the point is no longer of any effect, except to suggest mournful reflection. Unlike the learned counsel, the writer is too young to recall from personal recollection those days (of which we know only from family tradition and history) when throughout the South the position taken by him was sustained by experience and observation so general as to make it a matter of common knowledge.   In the halcyon days which he recalls, the household servants were indeed members of the master's family.   The servants' health and happiness were to the master a matter of prime importance, and the care and comfort of the master, the "missus" and their children was to the servant a matter of constant affectionate consideration.   And in sickness, it mattered not whether it was master, and none the less if it was the servant, who was stricken by disease; either and each with affectionate tenderness and absorbing interest nursed and ministered to the other until health was restored, or, if the dread Reaper could not be arrested, paid, with grief unaffected, the last painful services to the dead.   In those days the outhouses occupied by domestic servants of the family could be well said to be accessory to the domus mansionalis around which they clustered.

There was *identity of use*. Then the old definition, "a dwelling-house is a building *or cluster of buildings* in which a man with his family resides," was applicable. But such are not present existing circumstances.

"Those happy days shall nevermore return,
Those happy days that you have seen."

We have no wish to elaborate unfortunate conditions. Suffice it to say that it is well known that the habits, services, and feelings of those who intermittently can be induced to perform menial domestic service are generally wholly repugnant to the idea that they are domestic servants, and so subject to obey and be controlled by the master as to be even in any legal sense members of his family. While there may be separated instances to the contrary, the relation sustained by the hired help to the employer is such that now the practice of servants occupying houses within the curtilage is neither general nor usually desirable. But even in those instances where the servant occupies an outhouse near the main building, the control over the former is, from the nature of the case, so slight that to hold that such a servant's house is included as a matter of course in the stipulations of a policy of fire insurance on a dwelling-house and its additions would virtually destroy the protection of thousands of homes in this State by exposing them to risks of forfeiture for violations of stipulations in the policy by irresponsible persons at the servant's house, whose conduct could be neither foreseen, controlled, nor prevented by the insured. Even if the words of the policy, construed by their ordinary meaning in general use, did not fully satisfy us (as, however, they do) that the "two-story building and its additions" can not include a one-story servant's house 150 feet away, which was damaged by fire, we are fully persuaded that under the evidence no such identity of use was shown as would indicate that it was the intention of the parties to contract in reference to said servant's house. In our opinion neither the words "two-story frame building with its additions, adjoining and communicating," etc., used in one of the policies, nor the "two-story . . building and additions thereto occupied by assured as a dwelling only," in the other policy, can include the servant's house 150 feet away; and it was error to direct a verdict in favor of the plaintiff under the evidence submitted.

*Judgment reversed.*