## CLAY *v.* THE PHŒNIX INSURANCE COMPANY.

1. Without sacrificing the substantial limitations imposed upon the liability of an insurer by the contract between the parties, stipulations and conditions in policies of insurance, like those in all other contracts, are to have a reasonable intendment, and are to be so construed, if possible, as to avoid forfeitures and to advance the beneficial purposes intended to be accomplished.

2. Where a real estate renting agent is likewise an insurance agent, and, at the request of the owner of premises, procures a policy of insurance to be issued by a company represented by him upon tenements placed under his control as a renting agent, if the policy contains a condition that it shall be void if the premises should become vacant or unoccupied without notice to the company, and before a loss the premises do in fact become vacant and unoccupied, but with full knowledge on the part of the agent of the company of the fact, such knowledge would amount to notice to the insurance company, even though the information from which it was derived was really imparted to the person who was thus both real estate renting and insurance agent in business relating to the former rather than to the latter capacity. In such a case, notice is the potential fact necessary to the protection of the insurer; and if the agent, having full power to cancel the policy, nevertheless permits it to remain of full force after notice of the breach of condition, the company is bound.

3. In such a case, if the policy of insurance contain a stipulation "that if the property insured, or any part of it, is mortgaged or otherwise incumbered, either prior or subsequent to the date thereof, without consent of this company written thereon," the same should be void, but at the time it was issued, the agent of the company through whom the policy was issued knew of the existence of a mortgage upon the premises insured, and the company nevertheless issued the policy, but failed to enter thereon its consent to such incumbrance, but in the meantime accepted the premiums required, it will, in case of loss, be held to have waived such stipulation, and will be estopped to insist upon a forfeiture thereunder. In such case, refusal to insure, or cancellation of the policy, is the right of the insurer, and not forfeiture of insurance after loss.

4. Under the principles here announced, there was sufficient evidence to justify the submission of the questions of fact involved to a jury, and the court accordingly erred in granting a nonsuit.

August 16, 1895.   Argued at the last term.

ILLUSTRATIONS.

Before exposure to the Cathodic Ray.

Hand of mortgagee extended for *all*.

Hand of widow and ex-mother extended for *some*.

After exposure.

NOTE.—Color or shading indicates merit and the degree of it.

*Judgment reversed, with direction.*

CLAY v. THE PHŒNIX INSURANCE COMPANY.

1. Without sacrificing the substantial limitations imposed upon the liability of an insurer by the contract between the parties, stipulations and conditions in policies of insurance, like those in all other contracts, are to have a reasonable intendment, and are to be so construed, if possible, as to avoid forfeitures and to advance the beneficial purposes intended to be accomplished.

2. Where a real estate renting agent is likewise an insurance agent, and, at the request of the owner of premises, procures a policy of insurance to be issued by a company represented by him upon tenements placed under his control as a renting agent, if the policy contains a condition that it shall be void if the premises should become vacant or unoccupied without notice to the company, and before a loss the premises do in fact become vacant and unoccupied, but with full knowledge on the part of the agent of the company of the fact, such knowledge would amount to notice to the insurance company, even though the information from which it was derived was really imparted to the person who was thus both real estate renting and insurance agent in business relating to the former rather than to the latter capacity. In such a case, notice is the potential fact necessary to the protection of the insurer; and if the agent, having full power to cancel the policy, nevertheless permits it to remain of full force after notice of the breach of condition, the company is bound.

3. In such a case, if the policy of insurance contain a stipulation "that if the property insured, or any part of it, is mortgaged or otherwise incumbered, either prior or subsequent to the date thereof, without consent of this company written thereon," the same should be void, but at the time it was issued, the agent of the company through whom the policy was issued knew of the existence of a mortgage upon the premises insured, and the company nevertheless issued the policy, but failed to enter thereon its consent to such incumbrance, but in the meantime accepted the premiums required, it will, in case of loss, be held to have waived such stipulation, and will be estopped to insist upon a forfeiture thereunder. In such case, refusal to insure, or cancellation of the policy, is the right of the insurer, and not forfeiture of insurance after loss.

4. Under the principles here announced, there was sufficient evidence to justify the submission of the questions of fact involved to a jury, and the court accordingly erred in granting a nonsuit.

August 16, 1895. Argued at the last term.

Action on insurance policy. Before Judge Hunt. Bibb superior court. April term, 1894.

C. C. Clay sued the insurance company upon a policy of insurance, and for damages and attorney's fees alleged to be due him on account of the bad faith of the company in refusing to pay loss he alleged he sustained by the burning of a house and certain furniture covered by its policy of insurance. At the close of the testimony, defendant moved for a nonsuit on the grounds: (1) That the proof failed to make out any cause of action. (2) That the proof showed that when the policy was issued, and since, there was a mortgage upon the property, not disclosed to defendant. (3) That during the continuance of the policy the premises insured became vacant, in violation of the policy. (4) That no notice either of the mortgage or the vacancy was given to defendant; nor was any consent made by it thereon or therein, in accordance with the terms of the policy. The motion was sustained, and plaintiff excepted.

By the policy the company, subject to the conditions therein mentioned, insured plaintiff against loss or damage by fire to the amount of $900, $500 on a building "occupied by assured as a family residence," $200 on household furniture, including pictures, paintings, etc., and a piano, while contained therein, and $200 on piano. The term of insurance was from November 22, 1890, to November 22, 1891. The policy contained the stipulations, that if the property insured or any part of it was mortgaged or otherwise incumbered, either prior or subsequent to the date of the policy, without the consent of the company written on the policy, or if the premises should be occupied or used so as to increase the risk, or become vacant or unoccupied without notice to or consent of the company in writing upon the policy, then the policy was void; that the insurance might be terminated at any time at the request of the assured, and might also be terminated at any time at the option of the company, on giving notice to that effect and

refunding a ratable proportion of the premium for the un-
expired term of the policy; and that any person other than
the assured, who may have procured the insurance to be
taken by the insurance company, should be deemed the
agent of the assured and not of the company, under any
circumstances whatever, or in any transaction relating to
the insurance.    The policy was signed by defendant's presi-
dent and secretary, and countersigned at Macon, November
22, 1890, by W. W. & R. S. Collins, agents.    The record
of proof of loss contained, among other things, the state-
ments, that the total insurance on the property was $1,600
(in the policy notice was acknowledged of $500 concurrent
insurance); that the property belonged at the time of the
fire to C. C. Clay; that J. H. Tallman had a mortgage on
the house and lot for $2,500; that the building described or
containing the property was, at the time of the fire, in
charge of a negro in the yard and Mr. George Brooks living
near; that the fire occurred about eleven o'clock p. m.,
September 6, 1891; and that the house and furniture were
a total loss and were of the value of $2,750.    Plaintiff
introduced the demand made by him upon the company.
J. J. Clay testified: The house was destroyed by fire on the
night of September 6, 1891; it was worth $1,500, and con-
tained furniture and fixtures worth at a low estimate $1,000.
The list presented shows $1,502 worth of property con-
tained in the house, but I cannot say that it was all in there
at the time of the fire.    On Friday before the fire occurred
on Saturday or Sunday night, I went through the house
with Brooks.    We were going to move the furniture the
following Monday to Brooks' house, and thought there were
five or six loads, all of $1,000 or $1,200 worth.    I missed
two pictures which cost me $50 apiece.    Won't say there
were $1,500 worth in there at that time; I had it in there,
they stole it out.    There was a piano which was worth $300.
I suppose it was all burned.    I got there on Sunday night
or Monday after the fire and saw remnants on the ground,

the iron parts of them, parts of lounge and mattress springs which had not burned up. The house was totally destroyed, and I judge from the fire they all burned up. Can't swear positively that all the things on the list were there on Friday before the fire; I didn't take a list of them then, but noticed one or two things gone. I think everything was there, at least $1,000 worth; all the kitchen utensils were there. I procured this insurance from Hill who clerked for Collins & Bro., the agents of defendant. Hill and Collins were then doing business together. Think I told Hill, when I applied for insurance, I wanted the policy written in the name of C. C. Clay, the property belonging to him. Friday morning before the fire I went to Jim Keel to get a permit for the property to remain vacant, and I saw him and Bob Collins. The house was then unoccupied and had been two days. Collins & Bro. had charge of the property when I got back to Macon three weeks before the fire. I never took it out of their hands; it never was out of their hands. I told them Friday morning to rent it out if I did not succeed in making arrangements with Brooks. I rented it the last time myself on Monday evening, and the woman staid until Wednesday, and I turned her out for non-payment of rent. The property then belonged to C. C. Clay, and I was acting for him, and am now. If the case goes against me now, it will be my loss; at that time would have been his; at that time he was the owner of the property. I sold it to him, March 20, 1890, and was agent for Mrs. B. E. Clay in making the sale; the property did not originally belong to me but to her. When I took out the insurance I told Mr. Hill there was a mortgage on the property, and he would find the facts at the office of Turpin & Brother. I know he went to Turpin & Company to get it; I saw him going there; he says, "I will go around and get it," and he found there was other insurance on it; he couldn't get it anywhere else. I don't know whether I said the mortgage was to Tallman or not; I

notified him I had borrowed money and had to keep it insured to pay this mortgage, to secure the payment of loss. How I know he went to Turpin Brothers, I didn't know how much insurance I had there, I had insurance with some other gentlemen, I cannot remember who, and the policy expired and I then wished to do business with Collins Brothers; and that is how came them to get it. "Q. When you told Hill there was a mortgage on this property, he wrote the policy any way, did he? A. I have got it there. Q. He did not require any statement made by you other than that? A. I do not remember what he said, it has been a long time ago; I paid the money, I know he got my money; I reckon it was for that. When I paid him the money I never got the policy; I don't think I saw it in two or three months. I don't believe I had it when the fire occurred; I am under the impression that I did not have it at all, I think he had it. I just left it (policy) there; I am under that impression, I may be wrong. I never knew what company it was in; I telegraphed to Bob Collins to meet me at the depot, and he did it. I am under the impression that I found the policy at his house after the fire." I just told him to go to Turpin Brothers and find out about that thing and write so much on that house. I had a talk with Robert and W. W. Collins. "Q. Did you explain to Robert there was a mortgage on it? A. I don't think I talked to him; I think all the transaction was done with Jud Hill. I do not remember that I talked with Bob or W. W. The whole transaction was with Hill; he was the clerk in the office. I do not know who instructed the $500 (con.) insurance put there. I cannot swear I told Mr. Hill to put it there. I told him there was other insurance on it, and he asked me who had it, and I told him Turpin had it. I did take out a policy of insurance with Turpin & Company; don't remember the amount. The date of that policy is November 22, 1890. I told him to go to Turpin and he would find the additional insurance which I had taken out

on the policy." I was under the impression he went there; but afterwards I saw he had $500 on it, and I thought he must have gotten it from them, for they were the only ones that knew it. I never told him there was $500 other insurance; told him to go and find out from Turpin Brothers, for I had forgotten what I had. "Q. Did you see Mr. Hill at any time after you made this application for insurance about it? A. I saw him or some of them that got some money from me." I paid the premium for this policy, and must have paid it to their agents Collins & Brother. I negotiated with Hill for the insurance; I told him about the mortgage on the property; I told him there was other insurance on it. I think the house was unoccupied at the time of the fire. There were negroes living, you may say, in the same yard; there was no partition; it was like living in and occupying the house. On Wednesday before the fire I turned the negro out because she would not pay; I did not take hold of her and turn her out, but gave her notice to get out. On Friday before the fire I was at the office of Collins & Brother, and stayed there some time. They knew the house was unoccupied. I told Bob Collins and Hill to try and get somebody in it; that I thought I would have somebody in it Monday, and gave them my reasons: that Brooks would move the furniture out when I came back Monday, and he had a party he thought would take it and furnish the furniture. "Q. Was there anything more said about its being vacant, as to what you ought to do or them? A. No, sir, Mr. Keel told me—I don't remember what they told me. I says, 'Get somebody in it,' and they had had charge of it for a long time. They said, 'All right.' I don't remember what they told me. I said, 'Get somebody in it.' They had charge of it for a long time. Q. Who did? A. Jud; I think he got $10 a week from it, renting it out and keeping it up like an agent will for a man. Q. Now you say you gave them notice it was vacant? A. They knew it was vacant; I talked with them about its being vacant be-

fore I left. I told them that I thought I would have a tenant Monday, but if I did not, to help me get one. I do not recollect what they said; I think they told me they would do their best. They gave me no notice that the policy would be cancelled, nor did they pay me any money for the unexpired term. When I went off I did leave this property to rent, and told Jim and Bob and Jud Hill to rent it out for me. They were all engaged in the real estate business. Q. Didn't you say upon your first cross-examination, that you returned to Macon somewhere between three and four weeks before this loss occurred, and took charge of the property yourself and took it out of Collins & Brother's hands? A. No, sir, I don't know that I took it out of their hands, but I tried to rent it out. I am under the impression there was no one in it when I got here; that Collins did not have any one in it, and I put some one in it and they were to pay their rent in advance, and did not, and I told them to get out," Wednesday, I think, before the fire. The written portion of the policy is in Hill's handwriting. The mortgage to Tallman was given by Mrs. B. E. Clay. I have been in Collins Brothers' office and saw Hill there at work, and Collins had told me that Hill had charge of this business, had charge of their insurance business, that he had more to do with the insurance than he, Collins, did; I think I heard both Bob and W. W. Collins say this; know I have heard Bob say so time and again before and after the loss occurred. Hill has done business in the presence of Collins about the property with me, and paid the insurance before him and W. W. Collins both; and I have talked to Hill about it in their presence; his business was with Collins & Brother, and he generally managed their business. I think both the Collins were present when we were talking about it, when W. W. & R. S. Collins were managing and renting out for me the property under discussion. I think they had charge of this property at the time. When I went to get this insurance I went to Hill and told him to get it for

me.　Don't remember that I told him what company; am under the impression that he advised me, or it was through his influence that I took it out in the company that I insured with, though I generally left it with them.　The mortgage on the property has been paid off.　The property covered by the mortgage is worth fully $15,000.　I think the original amount of the mortgage was four or five thousand dollars, and was the only mortgage on the property that I remember.

Brooks testified, in brief: The house was burned about half past twelve o'clock on the night of September 6, 1891. The top of the house was just falling in when I got to the fire, and we could see through the windows that the house contained furniture.　The house and its contents were all destroyed.　At the instance of Mr. Clay I procured a negro man to stay at this house at night.　I cannot say that he stayed there at night; I told him to go and stay there, because Mr. Clay asked me to do it the Friday before.　I saw the man every morning coming from the direction of the house.　I cannot swear that he went there.　He was in my employment.　I know everything was in the house Friday before the fire, because I saw it; whether it was moved out between then and the time of the fire I do not know.　I lived about two blocks from the house.　I have seen the boy coming from there every morning, but didn't see him go there at night, for I was busy.　I never saw him the night of the fire.　When I saw him coming every morning from that direction, he was coming to my house where he lived; he was almost to my fence. I think this was on Thursday or Friday morning when I saw him coming; it was the only morning that I noticed him.　I did not give him a key with which to get in the house, and do not know how he got in; suppose the house was closed, but cannot say.　Did not see the man the night of the fire, and not until the next morning at breakfast.　There was no tenant in the house; had moved out two or three days before.　I was there with

Mr. Clay on Friday and saw a negro woman there. Mr. Clay instructed me to get some one to take care of the house a week or ten days before the fire, but not the Friday I was there with him; it was between this week or ten days and the time of the fire that I saw the woman occupying the house.

*Hardeman, Davis & Turner*, for plaintiff.
*Dessau & Hodges* and *C. L. Bartlett*, for defendant.

ATKINSON, Justice.

The official report states the facts.

1. Courts are not at liberty to arbitrarily disregard reasonable limitations imposed upon the liability of insurance companies under policies of insurance, by stipulations and conditions therein expressed; but in the construction of such policies, and such conditions and stipulations, the courts will look through the whole contract to the real intention of the parties at the time of the execution of the instrument, and give to it such construction as will impute to them a reasonable intendment, and such construction as will relieve against forfeitures, if that construction be consistent with the general intent expressed in the policy. Courts will presume, when policies of insurance are issued by insurance companies and they accept premiums paid therefor, that such policies are issued in good faith and with the design, upon the consideration received, to afford to the assured reasonable immunity in case of loss. If the condition be so repugnant to the stating clause of insurance as that both cannot stand together, courts should disregard the condition, upon the idea that it will not be presumed that the insurance company issues a policy of insurance with an intention never to become liable thereon. If the condition impose upon the assured a duty with respect to the thing insured, that duty must be performed, however slightly material to the interest of the insurer its performance may appear to be. If the condition or stipulation impose duties

which are wholly immaterial, or with respect to matters which are wholly irrelevant, the right of the assured would not be affected by a non-performance.   There is no greater sanctity and no more mystery about a contract of insurance than any other.   The same rules of construction apply to it as to other contracts, and the true rule for their interpretation may be stated to be, that stipulations and conditions in policies of insurance, like those in all other contracts, are to have a reasonable intendment, and are to be so construed, if possible, as to avoid forfeitures and to advance the beneficial purposes intended to be accomplished.

2. In the present case it appears from an inspection of the record, that the agent of the insurance company was likewise a real estate agent; that in his capacity as real estate agent, he had charge of the property of the assured. At the request of the assured, he caused a policy of insurance to be issued by the defendant company, of which he was then the agent, and which policy of insurance required that it be countersigned by the local agent before it should become valid.   The policy was in fact countersigned by the local agent, who was likewise the real estate agent having in charge the property of this plaintiff.   The policy contained a condition that if the property insured should become vacant and remain vacant and unoccupied for any length of time without notice to or the consent of the company indorsed in writing on the policy, the policy should become void.   No written consent that the property may remain vacant and unoccupied appears on the policy.   The question then is, did the company have notice that the property was vacant?   It will be seen that it is not required that the notice of the vacancy should appear in writing indorsed on the policy, but only where the consent of the company is relied upon as excusing the vacancy of the premises is this required.   The evidence demonstrates that the local agent of the company who issued this policy of insurance and who joined in the execution of the contract of insurance, was

fully advised that the property was vacant. No notice by implication is necessary to bring home to him the substantive fact that the house was vacant. He had express knowledge of that fact. He was the agent of the company —its *alter ego* with respect to this insurance, and notice to him must be held to be notice to the company. See 13 Wallace, 234–5. The policy of insurance remained in his custody—the assured being temporarily absent from the city—until after the loss. The premiums were duly paid by the assured and accepted by the company. With full knowledge that this property was vacant, they permitted the insurance to remain uncanceled, retained the premiums, and after loss, seek to be absolved from liability to the assured. The allowance of such a defense would be a gross fraud upon the assured. In such a case, the right of the insurance company is, upon notice of a breach of the condition, immediately to cancel the policy and terminate the contract of insurance. If, notwithstanding the breach of condition, it permit the policy of insurance to stand, and thereafter receive or retain premiums already received, it will be held to have waived the breach of condition. Such an interpretation is consistent with the principles of law consonant with the doctrines of sound morality, and gives to each of the parties the full benefit of the condition expressed in the policy.

3. There was likewise in the policy of insurance a condition to the effect "that if the property insured is mortgaged or otherwise incumbered, either prior or subsequent to the date thereof, without the consent of this company written thereon," the same should be void. It appears that at the time the application for insurance was made, information was given to the clerk in the office of the local agent by and through whom the insurance was effected, that a mortgage actually existed upon the property. According to the testimony of the plaintiff, and this is not disputed, he was informed by the local agent that the particular clerk in question was the one who had charge of the insurance busi-

ness.  It was his duty to obtain the very information imparted to him by the assured, and with this information the company, through its agent, issued the policy upon which this action was brought.  To allow the company to defeat a recovery by simply showing that a mortgage existed upon the property at the time the insurance was effected, would be to impute to it a deliberate purpose to defraud the assured.  It would be to permit the company to say to the assured: we had no intention of insuring your property in the first instance; the policy of insurance is a false token, by means of which we have obtained your money in payment of premiums; we received and retain the money with no intention of affording to you the immunity from loss which you had a right to expect the policy would afford. Courts will not in such a case impute a fraudulent purpose to the insurance company in the execution of its contract of insurance, but will rather presume that the policy was issued in good faith  and with an honest purpose to afford to the assured immunity against loss as stipulated therein.  It will be presumed conclusively, when, with knowledge that there was a mortgage upon the property, it nevertheless issued the insurance and accepted the premium, that it intended to waive the condition in question, and which would have the effect, otherwise, to render the policy void.  In such a case, if the company intend afterwards to insist that the condition is a valid one, it should refuse, in the first instance, to issue the policy, or, having issued it, it should exercise its right of cancellation before a loss; and failing this, it is estopped to rely upon the breach of condition.  It would have no right so to deal with the assured as to lead him to believe that his property was in fact insured, when the policy, according to its contention, was really void.

4. According to the view we take of the evidence submitted in this case, there was sufficient evidence to require its submission to a jury, and the court erred in granting a nonsuit.

Let the judgment of the court below be      *Reversed.*