# 𝕽𝖎𝖈𝖍𝖒𝖔𝖓𝖉.

THE BRANNING MANUFACTURING COMPANY, A CORPO-
RATION, and A. T. BAKER v. NORFOLK-SOUTHERN
RAILROAD COMPANY.

January 17, 1924.

Absent, Prentis, J.

1. CONTRACTS—*Consideration—Declaration—Failure to Allege Considera-
tion—Demurrer.*—In an action upon a contract the declaration is
demurrable where it fails to allege any consideration for the contract.

2. CONTRACTS—*Consideration—Failure to Allege Consideration—Waiver of
Objection.*—In an action upon a contract where a declaration contains
no allegation of consideration, upon evidence being tendered by the
plaintiff of consideration such evidence may be successfully objected
to by the defendant as not being within the allegations of the decla-
ration.  But where there is no such objection, and the testimony
for the plaintiff relied on to show consideration to support the al-
leged contract is admitted without objection on the part of the
defendant, defendant thereby waives all objection to any failure of
the declaration to allege consideration.

3. CONTRACTS—*Consideration—Declaration—Allegation of Consideration—
Mutual Promises—Case at Bar.*—In the instant case, an action upon a
contract, the contract alleged in the declaration is a bilateral con-
tract, containing mutual promises—on the part of the plaintiff to
lease (*i. e.* demise) the real estate mentioned to the defendants, and
on the part of the defendants to pay the rent therefor mentioned.
The promises are of such character that their performance re-
spectively by the one party would have been of advantage in law
to the other party.  In such case the mutual promises furnish a suf-
ficient consideration to support the contract.  Hence, as the decla-
ration by alleging such a contract alleged such mutual promises, it
alleged sufficient consideration.

4. CONTRACTS—*Consideration—Allegation of Consideration—Detriment Suf-
fered by Plaintiff.*—In an action upon a contract whereby plaintiff
agreed to lease to defendant certain land, the allegations contained
in the declaration of detriment suffered by the plaintiff because of
plaintiff's action in cancelling prior leases of the property, in reliance

upon the alleged contract of the defendants, is an allegation of suf-
ficient consideration to support the contract.

5.   LANDLORD AND TENANT—*Breach of Contract for a Lease—Action by Land-
lord—Measure of Damages.*—In an action by the owner of property
against a prospective tenent, not upon a lease, but for damages for
breach of a contract for a lease, the measure of damages is the dif-
ference between the agreed rent under the contract for the whole
term covered by the contract and the rental value to the plaintiff
of the property during the whole term, which latter value, of course,
consists, where the property is not used and could not have been
used to advantage by the plaintiff himself, of such rent, as the plain-
tiff, by the exercise of reasonable diligence, after the breach of the
contract, could have obtained from others during the whole term.

6.   LANDLORD AND TENANT—*Failure of Lessee to Execute Lease—Measure of
Damages.*—In case the lessee refuses to comply with the terms of
the agreement by which he is bound to execute an instrument of
lease, he is liable in damages to the amount of the excess of the
total rent which he agreed to pay during the term, over and above
what the owner is able to obtain from others after such refusal.

7.   LANDLORD AND TENANT—*Action Against Prospective Tenant for Failure
to Execute Lease—Measure of Damages—Rental Value.*—In an action
by the owner of property against a prospective tenant, not upon a
lease, but for damages for breach of a contract for a lease, the rental
value of the property may be shown by the market value of the lease,
or by the rent which was actually obtained by the plaintiff, if he
exercised reasonable diligence in obtaining all the rent possible.

8.   LANDLORD AND TENANT—*Breach of Contract for a Lease—Action by Owner
of Property—Burden of Proof—Damages.*—In the case of a breach of a
contract for a lease by a prospective tenant, the burden is upon plain-
tiff owner, in order to make out a case for more than nominal dam-
ages, to show that the rental value of the property was less than the
contract rental, and in the instant case the plaintiff did not intro-
duce or offer in evidence nor was there any evidence in the record to
sustain the burden of proof resting upon him, and therefore a verdict
for the plaintiff of substantial damages should be set aside as being
without evidence to support it.

9.   LANDLORD AND TENANT—*Breach of Contract for a Lease—Action by Owner
of Property—Evidence Insufficient to Support a Verdict for Plaintiff—
Minimizing Damages—Case at Bar.*—In the instant case, an action by
the owner of property against a prospective tenant, not upon a lease,
but for damages for breach of a contract for a lease, although noti-
fied to vacate, only one of the tenants occupying the property actu-
ally vacated it.   There was no evidence to show what was, at the
time of the breach of the contract, the market value of the lease,
or whether there was any new lease after the breach of the contract,
or whether, by the use of reasonable diligence, plaintiff might not

have obtained, after the breach of the contract, rent from the actual tenants and from others, which in the aggregate would have saved the plaintiff from loss by reason of any difference between the contract rental and the rental the plaintiff might have obtained during the whole term; nor was there any evidence that plaintiff made any effort whatever to minimize the damages after the breach of the contract for the lease.   No instruction was given the jury as to the measure of damages.

*Held:*  That the evidence was insufficient to support a verdict for the plaintiff of an amount approximately equal to the agreed rent which had accrued up to the breach of the contract.

10.  LANDLORD AND TENANT—*Breach of Contract for a Lease—Action by Landlord—Measure of Damages—Minimizing Damages.*—In an action by the owner of property against a prospective tenant, not upon a lease, but for damages for breach of a contract for a lease, it was evident that the jury based their verdict for plaintiff upon the view that the agreed rent up to the breach of the contract was the proper measure of the plaintiff's damages.   Such a verdict is contrary to the law in two aspects, one doing injustice to the plaintiff in not taking into consideration the agreed rent for the whole term of the expected lease, and the other doing injustice to the defendants in not taking into consideration as credits rent which might have been obtained from those actually having occupied the property, and rent which might have been obtained by the plaintiff, by reasonable diligence, in re-renting the property for the residue of the term after the breach of contract for the lease.

11.  LANDLORD AND TENANT—*Breach of Contract for a Lease—Action by Landlord—Liability of Defendant—Promoters—De Facto Corporations—Case at Bar.*—In the instant case, an action by the owner of property against a prospective tenant, not upon a lease, but for damages for breach of a contract for a lease, the evidence showed, without conflict, that no credit was extended by the landowner to the defendants personally.   One of the defendants, acting for himself and associates as promoters of an unnamed corporation, conducted the negotiations with plaintiff leading up to the contract for the lease.   Credit was solely extended to this corporation, and before the negotiations were completed and before the minds of the parties met upon all of the features of the contract for the lease, the name of the corporation was disclosed and given by the defendant negotiating with plaintiff as the principal for whom he and his associates had been conducting the negotiations, and the plaintiff accepted this principal as the party to the contract for the lease.

*Held:*  That defendants were not liable for a breach of the contract for the lease, as the credit was extended to the corporation.

12.  CORPORATIONS—*De Facto Corporations—Dealing with Corporation.*—In the instant case, an action by the owner of property against a pro-

spective tenant, not upon a lease, but for damages for breach of a contract for a lease, one of the defendants negotiated with plaintiff for the lease on behalf of himself and his associates solely as promoters of an unnamed corporation. Before the negotiation was completed the name of the corporation was disclosed and accepted by the plaintiff as the principal. In accepting such corporation as principal and in subsequent correspondence of the plaintiff with this corporation, demanding payment of rent, the plaintiff extended credit solely to the corporation, and in making the contract for the lease dealt with it as a *de facto* corporation.

*Held:* That, under such circumstances, whether such corporation had then come into actual existence was immaterial, if it did in fact afterwards and before action was brought come into actual existence so that it could be sued.

13. CORPORATIONS—*When Corporation Comes into Existence—Best and Secondary Evidence—Case at Bar.*—In the instant case, an action by the owner of property against a prospective tenant, not upon a lease, but for damages for breach of a contract for a lease, it appeared from a preponderance of the evidence on the subject that, while the prospective tenant, a corporation, had not in fact obtained its charter at the time the contract for the lease was entered into, it did afterwards obtain such charter before the action was brought. It was true that neither the charter nor a certified copy of it, which was the best evidence of the fact of the existence of the charter, was produced in evidence, although called for by plaintiff's counsel. But there was secondary evidence contained in the testimony of a witness, which was admitted without objection, which showed that the charter was obtained before the action was instituted.

14. APPEAL AND ERROR—*Judgment by Appellate Court—New Trial.*—In an action for breach of contract, where the case must be reversed, both on the ground that the verdict was contrary to law and without evidence to support it, and on the ground that the defendants were not liable so far as appeared from the evidence, but the evidence on both of these subjects was imperfectly developed on the trial, and for that reason there was not sufficient evidence before the trial court to enable it, under section 6251 of the Code of 1919, to decide the case upon its merits; nor was there sufficient evidence before the Supreme Court of Appeals to enable it to feel that it would attain the ends of justice by entering a final order under section 6365 of the Code of 1919, the case will be remanded for a new trial.

Error to a judgment of the Circuit Court of the city of Norfolk in an action of assumpsit. Judgment for plaintiff. Defendant assigns error.

*Reversed and a new trial awarded.*

This is an action of trespass on the case in assumpsit brought by the defendant in error, the Norfolk-Southern Railroad Company (hereinafter referred to as plaintiff), against the Branning Manufacturing Company, a corporation, and A. T. Baker (hereinafter referred to as defendants or by their respective names), to recover damages for the breach of a certain alleged contract of the defendants to lease from the plaintiff certain real estate belonging to the latter.

There was a verdict and judgment for the plaintiff for $1,200.00 damages, and the defendants assign error.

The declaration filed by the plaintiff is as follows:

"Norfolk-Southern Railroad Company, a corporation, plaintiff, complains of The Branning Manufacturing Company, a corporation, and A. T. Baker, defendants, of a plea of trespass on the case in assumpsit, for this to-wit: That heretofore, to-wit: On the 17th day of June, 1920, defendants contracted to lease from plaintiff certain real estate in eastern North Carolina, known as Old Station, for a period of one year, commencing on the 17th day of August, 1920, for an annual rental of twenty-two hundred and forty dollars ($2,240.00) payable in equal monthy instalments of one hundred and eighty-six dollars and sixty-seven cents ($186.67), payable in advance; and in reliance upon said contract plaintiff removed the former tenants from said property, prepared to deliver up possession to said defendants, but defendants broke their contract and failed and refused to take said property and failed and refused to pay any money to plaintiff; and said property has since remained without a tenant to a great loss to the damage of the plaintiff of three thousand ($3,000.00) dollars; and therefore it brings its suit."

There was no demurrer to the declaration.

On the trial the defendants pleaded the general issue of non-assumpsit.

The evidence shows that there was a preliminary agreement or contract for a lease, upon which the minds of the contracting parties met on June 25, 1920, with the understanding that the formal contract would be prepared, embracing the lease, as of date August 23, 1920, which formal contract was to be between the plaintiff and the Edenton Manufacturing Company, a corporation chartered under the laws of North Carolina.

The negotiations leading up to the aforesaid preliminary contract for a lease began before the Edenton Manufacturing Company obtained its charter or was organized (if it ever obtained its charter or was ever organized or came into existence as a corporation, which, as will appear below, was drawn in question on the trial), and the negotiations were conducted on the part of the intended lessee solely by the defendant Baker, acting for a time for himself and associates as promoters of their undisclosed principal (the intended lessee), a corporation expected to be formed, and culminated on June 25, 1920, in the preliminary contract at a time when the defendant, Baker, claiming to be the president of and assuming to act for the Edenton Manufacturing Company had disclosed the latter as the principal for which he had been theretofore acting, and the plaintiff, upon such disclosure by Baker, had accepted the "Edenton Manufacturing Company, a corporation chartered under the laws of North Carolina," as the party entering into said preliminary contract with the plaintiff.

The negotiations mentioned so far as shown in evidence were conducted by correspondence and also by personal interviews (the correspondence being between Baker and the president and assistant to the president of the plaintiff—the personal interviews being between Baker and such president on May 15th and afterwards

with such assistant to the president), extending over the period from May 15 to June 25, 1920.

The correspondence began with a letter of date May 18, 1920, from Edenton, N. C., from Baker to the president of the plaintiff, written on the letter paper of The Branning Manufacturing Company, of which Baker was president, which letter, so far as material, was as follows:

"Confirming conversation with you as of the 15th instant, * * * * * beg to advise as follows:

"* * * It is the purpose of several associates and myself to organize a small manufacturing plant, running a local saw mill and veneer plant, and we are desirous of leasing the site of the old freight warehouse and depot. This is occupied at the present time, part of the time as warehouse by several local people here, and by defunct canning factory.

"* * * would appreciate if you would give us some decision just as soon as possible."

By letter of May 27, 1920, the president of the plaintiff wrote Baker, so far as material, as follows:

"Absence * * * has prevented me from giving attention to your letter of May 18th * * *.

"We are now giving this matter consideration and I shall endeavor to write you within the next week or ten days as to what we are willing to do. If we decide to lease this property to you it would have to be upon the understanding that it would be vacated on or about ninety days' notice should we desire it for railroad purposes."

On June 4, 1920, the assistant to the president of the plaintiff wrote Baker as follows:

"In connection with your conversation in my office on May 28th, I now hand you herewith a blue print which shows outlined in yellow the property which we

·can arrange to lease to you upon our cancelling several leases which are now in effect.

"The rent of this property will be at the rate of .$2,240.00 per annum.

"If the above is satisfactory to you I will have form of agreement prepared and send it to you to be exe·cuted.    I assume that the lease should be made in the name of The Branning Manufacturing Company."

On June 14, 1920, the assistant to the president of the plaintiff again wrote Baker as follows:

"Referring to the enclosed copy of my letter to you ·of June 4th.    As stated to you in conversation recently, we are withholding serving notice of cancellation of several existing agreements for lease of parcels of this property at Edenton, and until we have a definite acknowledgment of your acceptance of the lease of these premises, based on the conditions agreed upon when you took the matter up with me in my office, namely: That we would lease this property to you for one year subject to our right to cancel it at any time on ninety days' notice, the lease to continue after the expiration of that year until ninety days' notice is given to vacate, the rental to be at the rate of $2,240.00 per annum, as stated in my letter of June 4th.    Some of the leases ·referred to require sixty days' notice and some of them require thirty days' notice."

On June 16, 1920, Baker had a conversation over the telephone with the assistant to the president in response to the said letter of the latter of June 4th, and stated that he (Baker) accepted the terms of that letter and that it would be entirely proper for the plaintiff to serve notice of cancellation of existing leases.

On June 17, 1920, the assistant to the president of the plaintiff wrote to Baker the following letter:

"Referring to my letters of 4th and 14th and to our

conversation yesterday.   In accordance with your request I am arranging to have notice of cancellation extended to those parties who are now occupying space within the property outlined in yellow on the blue print I sent you.   Will you kindly write me confirming the notice you gave of your intention to use this property on the terms stated in my two letters to you of June 4th and 14th and *also advise me with whom the contract should be made* "   (Italics supplied.)

On June 18, 1920, Baker wrote the following letter to the assistant to the president of the plaintiff:

"Regarding lease to myself and associates, the terms in consideration as set forth in your letters are satisfactory to us, although we had anticipated paying a smaller rent, knowing what amounts of revenue your company have been deriving from this property. Nevertheless if this is your best offer we will be compelled to accept same, and kindly have the necessary papers drawn.

"This lease should be made to *the Edenton Manufacturing Company, a corporation chartered under the laws of North Carolina.*"   (Italics supplied.)

On June 25, 1920, the assistant to the president of the plaintiff wrote Baker as follows:

"I have your letter of June 18th accepting the terms as set forth in my letter of June 14th, covering the lease of some space at Edenton *to the Edenton Manufacturing Company* and I am now preparing contract covering the same.   This contract will be dated August 23, 1920. As I explained to you it was necessary to give sixty days' notice to parties occupying a part of this space desired by you and the sixty days' period ends on August 23rd."   (Italics supplied.)

On September 2, 1920, the assistant to the president of the plaintiff wrote the following letter to Baker as president of the Edenton Manufacturing Company:

"Mr. A. T. Baker, President,
  "Edenton Manufacturing Co.,
    "Edenton, N. C.
"Dear Mr. Baker:

"In connection with our previous correspondence, I now hand you herewith contract, in duplicate, to cover the use of certain of our property at Edenton. Will you kindly have both copies executed by the proper officer of *the Edenton Manufacturing Company* and return them to me?" (Italics supplied.)

The formal draft of contract referred to in this letter accompanied it and was received by Baker, the draft of the contract being on the form of a lease from the plaintiff to the "Edenton Manufacturing Company, a corporation duly organized and existing under and by virtue of the laws of the State of North Carolina."

The lease contained a great number of covenants, many of which were not expressly embraced in the aforesaid preliminary agreement. The testimony for the plaintiff, with respect to the covenants not expressly embraced in the preliminary agreement, is that they were the "usual" covenants contained in leases of property made by the plaintiff. There was no testimony for the defendants with respect to such custom, but they did introduce testimony by cross-examination and otherwise seeking to show that the effect of certain of the covenants contained in the formal draft of the contract would have been to deprive the lessee of the use of the property given by the preliminary contract aforesaid.

Between September 2, 1920, and March 12, 1921, there were a number of letters from the plaintiff, one of February 25, 1921, written by the general solicitor and the others by the assistant to the president of the plaintiff, all addressed to Baker as "president of the Edenton

Manufacturing Company," urging execution of the formal contract by the latter company and claiming rent as owing by the latter company to the plaintiff from August 23, 1920, under the aforesaid preliminary contract; and a bill was rendered by the plaintiff on February 25, 1921, against the Edenton Manufacturing Company for $1,120.00 as rent due from the latter to the former for the premises in question from August 23, 1920, to February 23, 1921, at $187.67 per month.

There were letters from Baker to the plaintiff as of date October 7, November 13, December 6, 1920, to the effect that the formal contract was in the hands of "our attorneys for approval" or "advice" and that reply would be made to plaintiff's letters as soon as such advice could be obtained.

On January 5, 1921, Baker wrote the assistant to the president of the plaintiff as follows:

"Will you kindly advise the undersigned what time would be convenient to see you as regard to proposed lease of your property in Edenton, as under the lease we do not have enough room to put up any building whatsoever.

"I feel that I could explain this situation in person better than in writing; hence my request for a conference."

To this letter the assistant to the president of plaintiff replied by letter to Baker, "president of Edenton Manufacturing Company," as follows:

"Your letter of January 5th:

"I shall be glad to see you to discuss this matter any time this week, except Saturday, or any time next week."

The evidence does not disclose that any interview, such as proposed in the two letters last mentioned, was ever had.

On March 12, 1921, Baker wrote the assistant general solicitor of the plaintiff as follows:

"In reply to your letter of February 25th, beg to state that we disclaim any responsibility in regard to lease forwarded to us for our approval by Mr. Hawkins, assistant to the president of Norfolk-Southern Railroad Company. This lease has never been signed nor agreed to.

"We will gladly discuss this matter with you if you care to do so but feel that we have no responsibility whatsoever in regard to any rental claims in regard to the Edenton property."

On the trial the assistant general solicitor of the plaintiff, who made the draft of the formal contract aforesaid, after February 25, 1921, testified he wrote Baker a number of times asking for a personal interview and stating that, if Baker had any objections to the formal contract as drawn, the witness wanted to take the matter up and straighten it out. That witness finally got a conference with Baker in June, 1921, at which time Baker stated that "the Edenton Manufacturing Company had been organized;" but "said something about he could not use the property with those railroad tracks there" (a number of railroad tracks which were shown, however, on the blue print which accompanied the above mentioned letter of June 4th); and that Baker also stated "that business got so poor that they found they could not use the property and therefore they didn't go ahead with it." That witness said to Baker that witness "believed that if he made any objection to them that the company would have to move the tracks or said something about it."

On the trial Baker testified that he was president and treasurer of the Branning Manufacturing Company, and "president of the Edenton Manufacturing Com-

pany;" that the Edenton Manufacturing Company is a corporation of North Carolina; that the Edenton Manufacturing·Company was going to operate the property intended to be leased from the plaintiff, and that that was the purpose for which the negotiations for the lease were had. Thereupon the following appears in the record on the examination of this witness in chief on the trial:

"Q. Had that company come into existence?

"Mr. Martin" (counsel for plaintiff) "I ask for the charter.

"The Court: He is leading up to that I imagine.

"Mr. Lankford" (counsel for defendants): "I am leading up to that. The company was not completed.

"Mr. Martin: In order to have a corporation there has to be a charter. The charter is a definite paper and official, issued by the State and we have been informed this was never chartered or operated and we want to raise the point because it is important.

"The Court: There is no objection to the question.

"Mr. Martin: If it will be understood that a charter was not granted.

By Mr. Lankford:

"Q. Was this company ever operated, The Edenton Manufacturing Company?

"A. No.

"Q. Why was it not?

"A. The chief reason was we could not find a site that was suitable.

"Q. Was the charter applied for?

"A. Yes.

"Q. Would the corporation have been complete if the negotiations with the Norfolk and Southern had been completed?

"A. I think so; yes."

This witness then testified, in substance, that because of the restrictions contained in the covenants inserted in the formal draft of the contract aforesaid, which were not embraced in the preliminary contract or agreement for the lease to the Edenton Manufacturing Company, the lease would have been worthless to that company, and that that was the reason that company refused to perform the preliminary contract or agreement for the lease. That the Edenton Manufacturing Company was "ready and willing to operate" under the lease contracted for.

On cross-examination this witness further testified, in substance, that the charter for the Edenton Manufacturing Company was applied for through an attorney "not long after September" (1920) who had a copy of the charter if they had a copy; that witness did not himself have, and was unable to produce at that time, a copy of the charter; that "we could apply to the Secretary of State of North Carolina" for a copy of the charter; that witness had not obtained a copy himself as he didn't think it was of consequence;" that witness' "understanding is we are incorporated."

"Mr. Martin: I ask for the charter, your Honor.

"Mr. Lankford: He said Mr. Prudent (the aforesaid attorney who applied for the charter according to witness's testimony) has it if anybody has it."

By Mr. Martin:

"Q. I understood you to say that the proposed Edenton corporation was never organized and never had a meeting?

"A. Never operated.

"Q. It was never operated?

"A. No, sir.

"Q. Were there any minutes ever kept of the Edenton Manufacturing Company?

"A.    The minute book—I am unable to state about that.

"Q.    I would like for you to produce it if you have it; if you have got it?

"A.    No; I haven't got it.

"Q.    Although you were supposed to be president of it?

"A.    Yes.

"Q.    You never had that book?

"A.    I don't think so; no."

On the subject of the damages sustained by the plaintiff, the testimony for the plaintiff showed that the annual rental it was receiving for the property in question from the prior tenants whom the plaintiff notified to vacate it by August 23, 1920, was only the aggregate of $154.50 per annum. That most of the property was vacant. The plaintiff gave the necessary notices to such tenants prior to August 23, 1920, to put plaintiff in the position of having the right to eject such prior tenants. That none of the tenants paid the plaintiff any rent after August 23, 1920, except one, whose money was returned to him by plaintiff. But none of plaintiff's witnesses knew or stated that any of the prior tenants in fact ever vacated the property prior to the trial (November 3, 1921), or what the property was then renting for; and there was no evidence before the jury tending to show what was the market rental value of the property at any time during the year covered by the preliminary agreement or contract for the lease, or that the plaintiff made any effort to rent the property to any one else than the defendants during such prior year.

The testimony for the defendants tended to show that all of the prior tenants continued as tenants upon the property after August 23, 1920, except one, who va-

cated about that time in compliance with the notice to do so given by the plaintiff and that the rental which would have been paid by that tenant was $20.00 per year.

The evidence for the defendants is to the effect that if there was any breach of contract it was a breach by Edenton Manufacturing Company, and that it occurred when the above mentioned letter from Baker was written of March 12, 1921.

There is no evidence for the plaintiff tending to show that there was any further negotiations with the defendants or the Edenton Manufacturing Company after the interview with Baker in June, 1921, above referred to.    The action was brought in September 1921.

*W. L. Devany, Jr.*, and *Wolcott, Wolcott and Lankford*, for the plaintiff in error.

*Jas. G. Martin & Bro.*, for the defendant in error.

SIMS, J., after making the foregoing statement, delivered the following opinion of the court:

All of the questions presented for decision arise upon the assignment that the trial court erred in overruling the motion of the defendants in the court below to set aside the verdict, and grant a new trial on the grounds that the verdict was contrary to the law and the evidence.    We find it unnecessary to deal with a number of these questions.    Those we deal with will be disposed of in their order as stated below.

[1, 2] 1. Should the verdict have been set aside because there was no consideration alleged in the declaration?

The question must be answered in the negative, for three reasons:

(a) The defect, if it exists, rendered the declaration demurrable. Burks Pl. & Pr. 129, 130. There was, however, no demurrer to the declaration. It is true that if the declaration contained no allegation of consideration, upon evidence being tendered by the plaintiff of consideration, such evidence might have been successfully objected to by the defendant as not being within the allegations of the declaration. But there was no such objection, and the testimony for the plaintiff relied on to show consideration to support the alleged contract was admitted without objection on the part of the defendants. They thereby waived all objection to any failure of the declaration to allege consideration.

[3] (b) In the next place, the contract alleged in the declaration is a bilateral contract, containing mutual promises—on the part of the plaintiff to lease (*i. e.* demise) the real estate mentioned to the defendants, and on the part of the defendants to pay the rent therefor mentioned. The promises are of such character that their performance respectively by the one party would have been of advantage in law to the other party. In such case the mutual promises furnish a sufficient consideration to support the contract. 1 Williston on Contracts, sec. 103-e, 103-d, 103-f, 2 *Idem*, sec. 873. Hence, as the declaration by alleging such a contract alleged such mutual promises, it alleged sufficient consideration.

[4] (c) Upon elementary principles, the allegations contained in the declaration of detriment suffered by the plaintiff because of plaintiff's action in cancelling prior leases, in reliance upon the alleged contract of the defendants, is an allegation of sufficient consideration to support the contract.

2. Was the verdict for $1,200.00 damages contrary to law and without sufficient evidence to support it?

The question must be answered in the affirmative.

[5] This being an action by the owner of the property against the prospective tenant, not upon the lease, but for damages for breach of the contract for a lease, the measure of damages, as is well settled, is the difference between the agreed rent under the contract for the whole term covered by the contract and the rental value to the plaintiff of the property during the whole term—which latter value, of course, consists, where the property is not used and could not have been used to advantage by the plaintiff himself, of [such rent as the plaintiff, by the exercise of reasonable diligence, after the breach of the contract, could have obtained from others during the whole term. *James* v. *Kibler's Adm'r*, 94 Va. 165, 25 S. E. 417, and authorities therein cited; 3 Williston on Contracts, sec. 1405, pp. 2495-6; *Massie* v. *Bank*, 11 Tex. Civ. App. 280, 32 S. W. 797; Tiffany on Landlord and Tenant, sec. 67, p. 393.

[6] As said in the work last cited (sec. 67, p. 393): "In case the lessee refuses to comply with the terms of the agreement by which he is bound to execute an instrument of lease, he is liable in damages to the amount of the excess of the total rent which he agreed to pay during the term, over and above what the owner is able to obtain from others after such refusal." Citing authorities.

In effect, the measure of damages stated minimizes the damages of the plaintiff in such case, which is a duty which rests upon the plaintiff in all such cases. *James* v. *Kibler's Adm'r, supra,* 94 Va. 165, 26 S. E. 417.

[7] The aforesaid rental value may be shown by the market value of the lease (*James* v. *Kibler's Adm'r*); or by the rent which was actually obtained by the plaintiff, if he exercised reasonable diligence in obtaining all

the rent possible, 3 Williston on Contracts, sec. 1405, pp. 2495-6.

[8] The measure of damages mentioned is practically the same as that which is applicable in actions by the seller against the buyer for nonacceptance of goods which remain in the possession of the seller. In such case "the burden is upon the plaintiff to show what damage, if any, he has suffered;" and "it is incumbent upon him, in order to make out a case for recovery of more than nominal damages, to show that the market value of the goods is less than the contract priced" (3 Williston on Contracts, sec. 1378, p. 2453). So, in the case of a breach of a contract for a lease by a prospective tenant, the burden is upon the plaintiff owner, in order to make out a case for more than nominal damages, to show that the rental value of the property was less than the contract rental.

The plaintiff did not introduce, or offer in evidence, nor is there any evidence in the record to sustain the burden of proof just mentioned resting upon the plaintiff.

[9, 10] According to the evidence, the breach of the contract for the lease occurred either in March or June, 1921, certainly not later than the last named date. Although notified to vacate, it seems that none of the tenants occupying the property actually vacated it, save one. And there is no evidence to show what, at the time of the breach of the contract, was the market value of the lease (which would have carried with it the right of the lessee to collect from the tenants actually having occupied the property a fair rental for such use and occupation); or whether there was any new lease after the breach of the contract; or whether, by the use of reasonable diligence, the plaintiff might not have obtained, after the breach of the contract, rent

from the actual tenants and from others which in the aggregate would have saved the plaintiff from loss by reason of any difference between the contract rental and the rental the plaintiff might have thus obtained during the whole term; nor is there any evidence that the plaintiff made any effort whatever to minimize the damages after the breach of the contract for the lease.

There was no instruction given to the jury as to the measure of damages. They were left without any standard to guide them on this subject. The amount of the verdict, $1,200.00, is approximately the amount of the agreed rent which had accrued under the contract, up to March 12, 1921, without any credit for rent which might have been obtained for the actual use and occupation of the property by the former tenants, who in fact remained in the actual occupation of the property, and it seems evident that the jury based their verdict upon the erroneous view that the agreed rent up to the breach of the contract was the proper measure of the plaintiff's damages. Such a verdict is contrary to the law in two aspects—one doing injustice to the plaintiff, in not taking into consideration the agreed rent for the whole term of the expected leased, and the other doing injustice to the defendants, in not taking into consideration as credits rent which might have been obtained from those actually having occupied the property, as aforesaid, and rent which might have been obtained by the plaintiff, by reasonable diligence, in re-renting the property for the residue of the term after the breach of contract for the lease. The defendants, of course, cannot be heard to object to the verdict because of its former aspect, as it is evident that they were not injured thereby, and the plaintiff is not making any such complaint; but the defendants have just ground to object, as they do, to the verdict because of

the latter aspect of it.    Moreover, as aforesaid, even if the verdict was based on the consideration of the matters involved in the latter aspect of it, there was not sufficient evidence bearing thereon to support the verdict.

3. Were the defendants so far as disclosed by the evidence in the record liable to the plaintiff for damages for breach of contract for the lease mentioned in such contract?

The question must be answered in the negative.

[11, 12] The evidence shows, without conflict, that no credit was at any time extended to the defendants personally; that the only connection the defendants had with the contract in question was in conducting, through the defendant Baker, the negotiations with the plaintiff leading up to the contract for the lease. These negotiations were begun and conducted by Baker, acting for himself and associates solely as promoters of an unnamed corporation intended to be formed, to which corporation the credit was solely extended, and before the negotiations were completed and before the minds of the parties met upon all of the features of the contract for the lease, the name of the corporation, to-wit, the "Edenton Manufacturing Company, a corporation chartered under the laws of North Carolina," was disclosed and given by Baker to the plaintiff as the principal for whom he and his associates through him had been conducting the negotiations, and the plaintiff accepted this principal as the party to the contract for the lease, in lieu of the aforesaid promoters, as evidenced by the letters of the assistant to the president of the plaintiff to Baker of June 17, 1920, asking for the name of the principal, "with whom the contract should be made;" the letter of Baker to such assistant, in response, of June 18, 1920, disclosing the aforesaid prin-

cipal as aforesaid; and the letter of such assistant to
Baker of June 25, 1920, accepting such principal as
aforesaid.   On this last named date, and not before,
the minds of the parties for the first time met upon all
of the features of the contract for the lease, including
the feature that the Edenton Manufacturing Company,
a corporation, etc., was to be the lessee.

It is argued in behalf of the plaintiff that the contract
for the lease was definitely closed on June 16th by con-
versation between Baker and the assistant to the presi-
dent of the plaintiff, in which Baker accepted the terms
of the intended lease as stated in the letter of the former
to Baker of June 14th.   But this position overlooks
the fact that, as appears from the letter of such assistant
to Baker of June 17th, the important element of the
contract, consisting of the meeting of minds upon the
intended lessee, was still open and undetermined; and it
was not until the above mentioned letters of June 18th
and 25th were written that the contract for the lease
was definitely closed, and the contract as closed was
between the plaintiff and the Edenton Manufacturing
Company, and not between plaintiff and the defend-
ants.

In accepting such corporation as such party, as
aforesaid, and in subsequent correspondence of the
plaintiff with this corporation, demanding payment of
rent, the plaintiff extended credit solely to such corpor-
ation, and in making the contract for the lease, dealt
with it as a *de facto* corporation.   Under such circum-
stances, whether such corporation had then come into
actual existence was immaterial, if it did in fact after-
wards and before this action was brought come into
actual existence so that it could be sued.

As said in *Carle* v. *Corhan*, 127 Va. 223, at p. 234,
103 S. E. 699, 702: "There is a general rule that persons

dealing with promotion of corporations to be thereafter formed are allowed the double security of the promoters and the corporation when it comes into being; but where it appears * * * that the contract was made solely on behalf of, and that the credit was extended solely to, a corporation which was then in process of formation, and which shortly thereafter procured its charter, the rule does not apply. *Strause* v. *Richmond, etc., Co.,* 109 Va. 724, 729, 65 S. E. 659, 132 Am. St. Rep. 937.''

[13] Upon the question whether the Edenton Manufacturing Company had come into existence before the action was instituted in the instant case, the testimony is directed solely to the question of whether the company had obtained a charter in the State of North Carolina. It was a *concessum* in the case that if it had obtained a charter the company thereupon came into existence. We need not stop therefore to set out the well settled rules as to when a corporation comes into existence and can sue and be sued when it obtains its charter, without more, and when it does not come into existence until it organizes. We deem it sufficient to say that we think that it appears from a preponderance of the evidence on the subject (which is set forth in the statement preceding this opinion), that while the Edenton Manufacturing Company had not in fact obtained its charter at the time the contract for the lease was entered into in the instant case, it did afterwards obtain such charter before this action was brought in September, 1921. It is true that neither the charter nor a certified copy of it (which was the best evidence of the fact of the existence of the charter) was produced in evidence on the trial, although called for by the plaintiff by counsel. But there was secondary evidence contained in the testimony of Baker, which was admitted

3

without objection, which shows by a preponderance of the evidence, as we think, that the charter in question was applied for and obtained before this action was instituted.

[14] 4. Our conclusion, therefore, is that the case must be reversed, both on the ground that the verdict for $1,200.00 damages was contrary to law and without evidence to support it, and on the ground that the defendants are not liable in the instant case so far as appears from the evidence in the record. But the evidence on both of these subjects was but imperfectly developed on the trial. For this reason we do not think that there was sufficient evidence before the trial court to enable it, under section 6251 of the Code, to decide the case upon its merits, nor is there sufficient evidence before us to enable us to feel that we would attain the ends of justice by entering a final order under section 6365 of the Code. We will, therefore, remand the case for a new trial.

As the evidence on a new trial may be different, we shall not deal with the question of what covenants, under the authorities on the subject, may be inserted in a formal draft of a lease which have not been expressly agreed upon in the contract for the lease, which is the chief question involved in the assignments of error which we do not pass upon.

*Reversed and a new trial awarded.*